IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIE PERKINS, R16760, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. **3:14-cv-00191-SMY-PMF** |
| | ) |
| WARDEN MARTIN, | ) |
| UNKNOWN PARTY, | ) |
| CALVIN S. PIND and | ) |
| UNKNOWN LIEUTENANT, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Willie Perkins is an inmate with the Illinois Department of Corrections ("IDOC"). Perkins filed this lawsuit on February 14, 2014 asserting that his Eighth Amendment rights were violated when correctional staff at Shawnee Correctional Center ("Shawnee") failed to protect him from an inmate assault. Judge Gilbert screened Perkins' Complaint pursuant to 28 U.S.C. § 1915A and held that Perkins stated a colorable Eighth Amendment failure to protect claim against defendants C/O Pind and an unidentified corrections lieutenant (Doc. 18). This matter is now before the Court on Defendant Pind's Motion for Summary Judgment (Doc. 59). Perkins filed a response in opposition (Doc. 64). For the following reasons, Pind's motion is **GRANTED**.

### BACKGROUND

Perkins entered IDOC custody at Stateville Correctional Center on October 29, 2010 (Perkins deposition, Doc. 60-1, p. 3). He was later transferred to Lawrence Correctional Center

1

and then East Moline Correctional Center ("East Moline"). *Id*. After spending about 11 months at East Moline Perkins was ticketed for fighting and transferred to Shawnee.

Shawnee is a medium security IDOC prison (Doc. 60-1, p. 4). Perkins was placed in "Three House" at Shawnee which consists primarily of inmates who attend school and work in the prison chow hall. *Id*. Unless the prison is on lockdown, inmates are allowed to use the day room in the mornings and afternoons. *Id*. Perkins typically spent his time attending school, singing in the prison choir, visiting the law library or using the prison gym and yard. *Id*.

Perkins asserts that Shawnee correctional staff should have prevented an attack on him by inmate Andrew Lamon. After one of Perkins' cellmates was transferred to the segregation unit, Lamon was placed in Perkins' cell in Three House (Doc. 60-1, p. 4). Perkins and Lamon initially had a good relationship with one another (Doc. 60-1, p. 5). Lamon was known in the unit as a jailhouse lawyer and had assisted Perkins with another prisoner civil rights lawsuit (Doc. 60-1, p. 10). Perkins had also shared some of his food and personal effects with Lamon (Doc. 60-1, p. 5).

In late October 2013, the relationship between Perkins and Lamon soured (Doc. 60-1, p. 10). On the morning of October 29, 2013, Lamon and Perkins were in their cell together (Doc. 60-1, p. 6). At about 6:30 A.M., Perkins was in the lower bunk reading the bible and Lamon was in the top bunk. *Id*. Perkins had also switched on a light that was mounted beneath the top bunk. *Id*. Lamon told Perkins "I'm going to beat your ass if you don't turn off that light." *Id*. Perkins ignored him and continued to read. *Id*. Other inmates in the unit overheard Lamon and told him to calm down. *Id*.

That same day, Perkins left the cell house to go to school (Doc. 60-1, p. 6). At school, Perkins told his teacher, Brian Adams, about the situation with Lamon. *Id*. Perkins asked Adams if he could fill out and submit a cell transfer request sheet on his behalf. *Id*. Adams said yes. *Id*.

Later that day, Perkins asked an unidentified wing lieutenant about his transfer request. *Id*. The wing lieutenant told Perkins to give him a few days and he would move one of the two. *Id*.

A few weeks passed and the tension between Perkins and Lamon persisted (Doc. 60-1, p. 10). Perkins was aware that Lamon had been attempting to get his prison sentence reduced and had recently lost his case. *Id*. As a result, Lamon was increasingly irritable. Id. Perkins also suspected that Lamon wanted to create an altercation so that he (Lamon) would receive a prison transfer. *Id*. Lamon directed his frustration at Perkins by standing in front of him and calling him a "bitch." *Id*.

The tension between Perkins and Lamon came to a head on November 18, 2013. That afternoon around 4:45 P.M., Lamon told Perkins that he was "tired of this shit" and Lamon began to pack up his belongings (Doc. 60-1, p. 11). Perkins asked Lamon what he was doing, and Lamon told him "You'll find out." *Id*. Suspecting that Lamon was about to start an altercation, Perkins asked an inmate outside the cell to call for a Correctional Officer. *Id*. Defendant Pind arrived shortly thereafter and released Perkins from the cell. *Id*. Pind then took Perkins to the counselor's office so that he could speak to the wing lieutenant. *Id*.

Perkins briefly discussed the Lamon situation with the wing lieutenant (Doc. 60-1, p. 12). The wing lieutenant told Perkins that he was going to keep him in the same cell, but that one of them would be transferred in the next few days. *Id*. After this discussion, the wing lieutenant directed Pind to take Perkins back to his cell and to bring Lamon to the counselor's officer. *Id*. A short while later, Pind escorted Lamon and placed him back in the cell with Perkins. *Id*.

That same day at 5:20 P.M., the cell doors in the wing opened (Doc. 60-1, p. 12). Lamon then exited the cell so that he could deliver some legal papers to another inmate down the hall named "Big Will." *Id*. After Lamon left the cell, one of the prison porters stopped by to talk to

Perkins (Doc. 60-1, p. 13). The porter told Perkins that he overheard Lamon telling Big Will that he was going to beat Perkins up. *Id*. At that moment, Lamon returned and started punching Perkins in the face. *Id*. Lamon then bit Perkins on his left ear, splitting the earlobe. *Id*. A minute or so after Lamon initiated the attack, correctional officers rushed in and split up the two. *Id*. Lamon was transferred to a different prison not long after the incident. *Id*.

## DISCUSSION

Rule 56(a) of the Federal Rules of Civil Procedure states that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for summary judgment, the court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Defendant Pind presents two arguments for summary judgment: (1) that he did not violate Perkins' rights under the Eighth Amendment; and (2) that he is entitled to summary judgment on the basis of qualified immunity.

The Supreme Court has recognized that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994), and that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828, 114 S. Ct. at 1974. Applying this standard, a prisoner states an Eighth Amendment failure to protect claim by alleging that "(1) he is incarcerated under conditions posing a substantial risk of serious harm, and (2) defendant-officials acted with deliberate indifference to that risk." *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (internal quote omitted). Mere negligence will not create Eighth Amendment liability; the plaintiff in a failure to protect case

must demonstrate that there was "a 'strong likelihood' rather than a 'mere possibility' that violence will occur." *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006).

Failure to protect claims generally arise out of a few different types of prison situations. One such situation is where the prisoner plaintiff exhibits characteristics that make them more likely to be victimized. See *Farmer v. Brennan*, 511 U.S. 825, 829, 114 S. Ct. 1970, 1975, 128 L. Ed. 2d 811 (1994) (transgender prisoner with feminine characteristics in male prison); *Walsh v. Brewer*, 733 F.2d 473, 475 (7th Cir. 1984) (prisoner plaintiff was targeted by other prisoners because he cooperated with prison officials). Another common failure to protect fact pattern occurs where the assailant is alleged to have a known propensity for violence. See *Brown v. Budz*, 398 F.3d 904, 907 (7th Cir. 2005); *Billman v. Indiana Dep't of Corr.*, 56 F.3d 785, 787 (7th Cir. 1995). Perhaps the most common fact pattern is where the prisoner plaintiff identifies a specific threat from a specific source. See *Lewis v. Richards*, 107 F.3d 549, 551 (7th Cir. 1997) (prisoner plaintiff was enemy of Gangster Disciples gang); *Haley v. Gross*, 86 F.3d 630, 634 (7th Cir. 1996) (prisoner plaintiff was placed with aggressive mentally ill cellmate); *Velez v. Johnson*, 395 F.3d 732, 734 (7th Cir. 2005) (pretrial detainee plaintiff attacked by cellmate).

Perkins has not provided any evidence that Lamon exhibited any particular violent tendencies or that there was some underlying animosity caused by other issues, such as gang membership. Additionally, Perkins has not alleged any characteristics that would make him vulnerable to attack. In fact, Perkins testified at his deposition that he was much larger than Lamon and "Put it like this, I could beat the bricks off him (Lamon) if I wanted to, but I made a promise to God and promise to my wife that I was not fixing to get no tickets" (Doc. 60-1, p. 13).

There is no evidence in the record that Pind had the authority to move prisoners between cells. Moreover, Pind did not ignore Perkins' complaints about Lamon. Rather, he took them

5

seriously and immediately escorted Perkins to the wing lieutenant's office for an interview. Under these circumstances and with all relevant facts drawn in a light most favorable to Perkins, The Court finds, as a matter of law, that Perkins has not established that Pind violated his Eighth Amendment rights. Accordingly, Pind's motion is granted.[1]

    SO ORDERED.

    DATED:  July 11, 2016 .

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**DISTRICT JUDGE**

---

[1] Having found no violation of Plaintiff's constitutional rights, it is unnecessary for the Court to address Defendant's qualified immunity argument.